AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

NORTHERN DISTRICT OF OHIO

UNITED STATES OF AMERICA
V.
JESUS C. MOREL
522 HAMILTON AVENUE
FARRELL, PA 16121

(Name and Address of Defendant)

## CRIMINAL COMPLAINT

CASE NUMBER: 4:02 MC062

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about JUNE 3, 2002 in MAHONING county, in the NORTHERN District of OHIO defendant(s) did, (Track Statutory Language of Offense)

KNOWINGLY AND INTENTIONALLY CONSPIRE TO POSSESS WITH INTENT TO DISTRIBUTE AND DID POSSESS WITH INTENT TO DISTRIBUTE A CONTROLLED SUBSTANCE, TO WIT: COCAINE IN EXCESS OF 500 GRAMS.

in violation of Title 21 United States Code, Section(s) 846, 841(a)(1), 841(b)(1)(B).

I further state that I am a(n) DEA TASK FORCE AGENT and that this complaint is based on the following
Official Title

facts:

SEE ATTACHED AFFIDAVIT

I hereby certify that this instrument is a true and correct copy of the original on file in my office.
Attest: Geri M. Smith, Clerk
U.S. District Court
Northern District of Ohio

By: [signature]
Deputy Clerk

FILED
02 JUN -4 AM 11:11
CLERK US DISTRICT COURT
NORTHERN DISTRICT OF OHIO
YOUNGSTOWN

Continued on the attached sheet and made a part ☒ Yes ☐ No

[signature]
Signature of Complainant

Sworn to before me, and subscribed in my presence,

June 4, 2002
Date

at YOUNGSTOWN, OHIO
City and State

GEORGE J. LIMBERT, U.S. MAGISTRATE JUDGE
Name and Title of Judicial Officer

[signature]
Signature of Judicial Officer

**AFFIDAVIT**

I, Daniel K. DeVille being duly sworn depose and state as follows:

1. This Affidavit is in support of a criminal complaint for Jesus C Morel.

2. Daniel K. DeVille is a Task Force Agent of the United States Department of Justice, Drug Enforcement Administration (DEA) and a Poland Village, Ohio Police Officer. Daniel K. DeVille has been a police officer for over five years, having been employed for three years at Lowellville Police Department, one year at the Mahoning County Sheriff's Office, and the Poland Village Police Department since February, 1999.

3. During the course of your Affiant's law enforcement career, your Affiant has written and executed search and seizure warrants for narcotics, dangerous drugs, and the records, books, and proceeds derived as a result of this illicit activity. Further, your Affiant has arrested numerous individuals for violations of state narcotics statutes.

4. Your Affiant, is an officer of the United States Department of Justice, Drug Enforcement Administration (DEA), within the meaning of Section 878(a) of Title 21, United States code, that is an officer empowered by law to conduct investigations, make arrests, and seize property for violations of Title 18, United States Code and Title 21, United States Code.

5. Your Affiant has received training by federal, state, and local law enforcement agencies in the investigation, detection, and apprehension of persons unlawfully possessing, distributing, and possessing with intent to distribute, and conspiring to distribute controlled substances.

6. Your Affiant has developed, conducted, and assisted with hundreds of narcotics investigations, including but not limited to conspiracy, undercover, reverse undercover, wiretaps, organized crime, transportation interdiction, and financial investigations relating to proceeds derived from the sale of narcotics.

7. Your Affiant has been involved in numerous firearms and narcotic related arrests, and has executed search warrants that have resulted in the seizure of firearms and/or dangerous drugs. Based on your Affiant's knowledge and experience, it is known that narcotics traffickers regularly carry firearms in order to protect and defend their drug trafficking operations.

8. Based upon my training, experience and discussions with other Agents and law enforcement officers, concerning the distribution of controlled substances, your Affiant is aware of the following:

   a. That large-scale narcotics traffickers often maintain on hand, large amounts of U.S. Currency in order to maintain and finance their ongoing drug business.

   b. That persons engaged in drug trafficking commonly conceal controlled substances, currency, financial instruments, precious metals, jewelry, titles to automobiles, and other items of value in their residences, businesses and automobiles.

   c. That when drug traffickers amass large proceeds from the sale of drugs that the traffickers attempt to legitimize these profits. That to accomplish these goals they often utilize domestic and foreign banks and/or financial institutions and their attendant services, securities, safe deposit boxes, cashiers checks, drafts, letters of credit, brokerage houses, real estate, "shell" corporations and businesses as "fronts" for their proceeds.

   d. That drug traffickers commonly "front" (provided on consignment) drugs to their customers or clients and frequently maintain records of same.

   e. That persons engaged in drug trafficking commonly conceal controlled substances, currency, financial instruments, precious metals, jewelry, titles to automobiles, and other items of value in their residences, businesses and automobiles

   f. That safes and other concealed compartments are often utilized as locations to store drugs, currency, assets and other proceeds and evidence of drug trafficking.

   g. That after purchasing controlled substances, traffickers will often transport or have transported these controlled substances to areas where they will distribute the controlled substances. That methods of transportation include but are not limited to commercial airlines, private aircraft, boats and ocean going vessels, rental and private automobiles, government and contract mail carriers.

   h. That drug traffickers often take or cause to be taken photographs or videos of themselves, their associates, their property and assets, and their product. That these photos are usually maintained in their residences.

   i. That drug traffickers often keep readily available the paraphernalia for packaging, cutting, weighing, and distributing controlled substances. That these items include but are not limited to scales, plastic bags, heat sealers, and cutting agents such as mannite, mannitol, lactose, lidocaine, and inositol

j. That drug traffickers commonly use electronic equipment to aid them in their drug trafficking activities. This equipment includes but is not limited to digital display pagers (beepers), mobile telephones, computers, speed dialers, electronic telephone and date books, money counters, fax machines, and police scanners.

k. That people who traffic in controlled substances frequently maintain firearms or other weapons to protect themselves, the controlled substances, and the proceeds of the sale of controlled substances.

9. On June 3, 2002 your affiant appeared before United States Magistrate George J. Limbert in Youngstown, Ohio and obtained search warrants for 282 Potomac Ave and 2115 Summer Street Youngstown, Ohio. Thereafter, Agents from DEA Youngstown assisted by Youngstown Police Department executed the search warrants at 282 Potomac and 2115 Summer St. Youngstown, Ohio.

10. At approximately 10:10 am, the first search warrant was executed at 282 Potomac Ave. The residence was not occupied at the time of entry. During the search of the residence approximately 3,638 grams of cocaine were found in the basement rafters. In the home Agents recovered a Mossburg 12 gauge shotgun as well as two bullet-proof vests. Also found in the home were letters and other personal belongings of Everson. The cocaine was field tested positive for the presence of cocaine.

11. At approximately 10:30 am, the second search warrant was executed at 2215 Summer St. At the Summer St. address, a loaded Taurus .40 caliber handgun was found in the closet of the master bedroom in which Everson was located. In the bedroom where Everson was located the window was open, outside in the driveway below the open window agents recovered a purple crown royal bag. In the bag Agents discovered several plastic bags. In the bags were approximately 59.6 grams of cocaine base (crack cocaine), approximately 116.5 grams of heroin, and approximately 33.4 grams of cocaine. All of the above narcotics were field tested, and each tested positive for the presence of the above drug. Also recovered in the residence were several items of drug paraphernalia including digital scales, a glass beaker, and other items used for packaging, using, and distributing cocaine. One of the packages containing the cocaine base (crack cocaine) was molded in the same shape as the glass beaker used to cook the crack. Agents also seized several pieces of miscellaneous paperwork relating to Everson's drug activity.

12. Inside the bedroom where Everson was located was a female who was later identified as Larae Price. Price advised Agents that she had spent the night with Everson and when the Police arrived at the residence Everson stood up and was running around the room. Price advised that she did not throw the bag found in the driveway out of the window and that she had never seen it before.

13. Later Everson was interviewed at the DEA Youngstown office. There, Everson advised that he had received the three and one half kilograms of cocaine the day

before when it was dropped off at his Potomac residence by three Dominican males from New York. Everson advised that he had met them through Julius Thomas before Thomas went to prison. Everson advised that he had received cocaine from them on numerous previous occasions. Everson further stated that one of the men is named Jesus who he contacts by calling his cellular phone (724-734-3204) another is named Chelo and a third unidentified Dominican male. Everson told the Agents that Jesus used to drive a black El Camino with a hidden compartment to transport the cocaine. Everson advised that Jesus is currently driving a red sport utility vehicle with out of state plates and a hidden compartment that is used to transport the cocaine. Everson told the Agents that when Jesus and Chelo come to the Youngstown area to distribute cocaine they stay at the hotels in the Farrell, Pennsylvania area and Jesus or other members of his organization make the trip from New York to Youngstown every three to four days.

14. Everson then placed a series of phone calls to Jesus to negotiate another purchase of cocaine from him. These phone calls were monitored and recorded. Jesus advised Everson that he was at the Eastwood mall in Niles, Ohio and would be travelling to Everson's Potomac Ave. residence to deliver the "white girls." Everson advised that "white girls" is code used between them for kilograms of cocaine.

15. At approximately 5:20 p.m.. Agents observed a red Ford Explorer sport utility vehicle with Rhode Island license plate arrive at 282 Potomac Ave. occupied by two Dominican males. One of the males is observed by Agents entering the home wearing a blue shirt. After approximately ten minutes Agents observed a Dominican male matching the same description appear from between two houses directly behind Everson's Potomac Ave. home onto Judson St. wearing a red shirt. The man was walking east on Judson St. looking over his shoulder. Agents approached the man and identified him as Jesus Morel the same individual Agents had observed entering the front of the Potomac Ave. home. Agents then spoke to a resident of the Potomac Ave. home who advised that Morel entered the front door looking for Everson. Morel was advised that Everson was not there and that the police had been there earlier in the day. The resident then advised that Morel hurried out the back door of the home abandoning the vehicle he was in. A blue shirt matching the one Morel was observed wearing was discovered on the ground behind the Potomac Ave. home.

16. Shortly after Morel was taken into custody, Agents observed the red Ford Explorer exit the drive onto Potomac Ave. Agents conducted a traffic stop of the vehicle that was driven by Marino Diaz. Diaz was then taken into custody and he and Morel were transported to the DEA Youngstown office. A trained narcotic detection canine was deployed on the outside of the vehicle. The canine gave a strong alert to the presence of a narcotic odor on the rear of the vehicle. The vehicle was then transported to the DEA Youngstown office.

17. At the DEA Youngstown office Morel and Diaz were both given their Miranda rights in English and Spanish. Morel advised that he wished to speak to an attorney before answering questions. Diaz agreed to speak to Agents concerning the events that had

transpired. Diaz gave the Agents consent to search the red Ford Explorer he was observed driving. Inside the vehicle Agents discovered a secret compartment located under the rear passenger seat. The compartment was equipped with a hydraulic door used to conceal kilograms of cocaine. Inside the compartment the Agents discovered a piece of aluminum foil containing approximately 33 grams of cocaine.

18. Agents then showed photographs of Morel and Diaz to Everson. Everson identified Morel and Diaz as the men who provided him with the three and one half kilograms of cocaine seized from his Potomac Ave. residence.

19. Based upon the foregoing there is probable cause to believe that Jesus Morel and Marino Diaz did conspire to possess with intent to distribute cocaine and did possess with intent to distribute a controlled substance, to wit: cocaine, in excess of 500 grams in violation of Title 21 United States Code Section 846 and Sections 841 (a)(1) and 841 (b)(1)(B).

Daniel K. DeVille, Task Force Agent
Drug Enforcement Administration

Sworn to and subscribed before me this 4th day of June, 2002.

Honorable George J. Limbert
United States Magistrate Judge